1124

H. R. Mallinson & Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Erie Silk Mills, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 13718, 13719.   Promulgated January 10, 1929.

*J. C. Peacock, Esq.,* and *C. E. Koss, Esq.,* for the petitioners.
*Orris Bennett, Esq.,* and *Hartford Allen, Esq.,* for the respondent.

1132

OPINION.

MILLIKEN: Petitioners complain of respondent's action in failing to include in the consolidated invested capital any value for the intangibles alleged to have been purchased by the petitioner partnership from Hiram R. Mallinson prior to March 3, 1917. Petitioners allege that the partnership of H. R. Mallinson & Co. bona fide purchased the intangibles used in connection with the business of H. R. Mallinson & Co., the sole proprietorship, from Hiram R. Mallinson, for and with interests or shares in the said partnership; that the intangibles so acquired had an actual cash value at the date of purchase of not less than $431,100.13; and that such intangibles should be included in the consolidated invested capital in accordance with the provisions of section 207 of the Revenue Act of 1917. Respondent

denies that any intangibles were bona fide purchased by the petitioner partnership prior to March 3, 1917, for and with interests or shares in the said partnership; and, though he conceded at the hearing that the intangibles used in connection with the business of H. R. Mallinson & Co., the sole proprietorship, were not without value at the time of organization of petitioner partnership, he denies that those intangibles had an actual cash value at the date of the alleged purchase of the amount claimed therefor by the petitioners. Thus, the first issue to be disposed of raises two questions of fact: (1) Did the petitioner partnership, H. R. Mallinson & Co., bona fide purchase from Hiram R. Mallinson, prior to March 3, 1917, for and with interests or shares in the partnership, the intangibles used in connection with the business of H. R. Mallinson & Co., the sole proprietorship, and, if so, (2) what was the actual cash value of such intangibles at the date of purchase?

We have not been favored with a brief in behalf of the respondent, but it appears, from oral statements of counsel at the hearing, that he takes the position that the transfer to petitioner partnership by Mallinson of all the intangibles used in connection with the business which he conducted as a sole proprietorship, under the name and style of H. R. Mallinson & Co., as a part of his contribution to the capital of the new partnership, constituted a gift and not a bona fide purchase by the partnership for and with interests or shares therein. Thus, there appears to be no question as to the ownership of these intangibles by the petitioner partnership, and the first question is narrowed to the inquiry as to whether the petitioner partnership came into ownership of these intangibles by way of a gift from Mallinson, or through a bona fide purchase thereof for and with interests or shares in the partnership.

The respondent justifies his position in respect of the character of the transaction by which petitioner partnership came into ownership of the intangibles in question upon his own interpretation of one lone paragraph appearing in the third article of the partnership agreement, which reads as follows:

It is understood that no valuation shall be placed upon the good will, trademarks, tradenames, orders on hand or other intangible assets of said firm (except book accounts) but that the amount of the capital account of the party of the first part [Hiram R. Mallinson] shall be determined solely on the value of the tangible assets and book accounts of said business.

Reading this lone provision of the agreement without reference to its other provisions, the respondent, by some manner of reasoning, reaches the conclusion that Mallinson contributed the intangibles to petitioner partnership without any consideration therefor and as a mere gift. We find nothing in the quoted language of the agreement to justify the conclusion reached by the respondent. Under the pro-

visions of the partnership agreement, both Mallinson and Hanson obligated themselves to make certain contributions to the capital of the partnership, which, in the case of Mallinson, was to include all of the intangibles of the business which he was conducting as a sole proprietorship, and to render certain services in the conduct of the business of the new partnership. The interest of each partner was fixed with due regard for their respective capital contributions and the obligations and undertakings which they respectively assumed. The quoted language of the agreement contains no negation of the obligation of Mallinson to transfer all of the intangibles of the sole proprietorship, nor of Mallinson's right to an interest in the partnership, in consideration of such transfer and the obligations which he assumed under the agreement. Nowhere in the record is there the slightest indication that Mallinson's contribution to the capital of the partnership, or any part of it, was intended or considered to be a gift on the part of Mallinson. On the other hand, the contract by virtue of which the partnership came into the ownership of these intangibles indicates quite clearly that in consideration of the transfer to the partnership by Mallinson of all of the assets, tangible and intangible, of the sole proprietorship, he was to have an interest of 70 per cent in the partnership. When the quoted provision of the agreement is read in conjunction with all others that precede or follow it, its meaning becomes clearly apparent. The agreement provides that in determining the earnings available for distribution to the partners there should be deducted interest equivalent to 6 per cent of the capital accounts of the partners, which was to be credited to the capital accounts of the latter; and it seems clear that the quoted language was inserted in the agreement with the intent to place a limitation on the amount of interest which would annually be credited to Mallinson. We are of the opinion that the intangibles paid in to petitioner by Mallinson were purchased by the petitioner partnership for and with interests or shares in said partnership, and that they may be properly included in the consolidated invested capital of petitioners for the fiscal year and period under consideration.

This brings us to the question as to the actual cash value of the intangibles in question at the date of purchase, June 1, 1915. Petitioner contends that this value was at least $431,100.13, and, in support of the minimum value claimed, offers the testimony of E. Irving Hanson, who was one of the partners of petitioner partnership, and evidence as to the earnings and as to the tangible assets employed in the business for the five-year period immediately preceding the organization of the partnership, and for the five-year period immediately following that event. That these intangibles had a very con-

siderable value at the date they were acquired by petitioner partnership seems clearly apparent from the evidence. The very favorable conditions existing in the business, the extent of the development of the intangible properties used in connection therewith, and the position the business and its owners had attained in the silk industry through the high standard of quality which they had maintained in their products at the date the business and all its assets were acquired from Hiram R. Mallinson, are all set out in the findings of fact and need not be repeated here. All of these favorable factors reflect a very considerable value existent in the good will, trade-marks, and trade names of the business. We are not prepared, however, to accept the opinion expressed by the witness Hanson as to the value of the intangibles, at the date of acquisition, which he estimated to have been $1,000,000. Certainly the earnings of the business for the five and one-half year period immediately preceding the acquisition by the petitioner partnership of the intangibles do not reflect any such value. The average earnings of this period amounted to $104,363.64, while the average tangible assets employed in the business during the same period amounted to $501,107.11. The average earnings represent a return of approximately 20 per cent on the average tangibles for the period referred to. Were the value of the intangibles to be fixed at $1,000,000, the average earnings of the period would represent a return of less than 10 per cent on the intangibles, without any return on the tangible assets. To put it another way, assuming that 8 per cent represented a fair return on the tangible assets during the period referred to, there would be excess earnings attributable to the intangibles of $64,275.07, which would represent a return of only 6.42 per cent on the basis of an intangible value of $1,000,000, which is much less than the assumed fair return on the tangible assets. The occasions are rare when prudent business men will invest their funds in intangible properties of the character here under consideration, with all the risks and hazards that such investments involve, with the expectation, based upon the past history of the business, of realizing a return upon such investment less than that which might be reasonably anticipated upon the tangible properties.

There is testimony in the record that this was very stable business, justifying a lower rate per cent of capitalization of excess earnings to determine the value of the intangible properties. This testimony, however, is not supported by the record of earnings of the business. During the six-year period preceding the date of purchase, we find severe fluctuations in the earnings, with the peculiar condition present of the earnings reaching the maximum and minimum quite regularly in alternate years. For the period stated, the earnings were as follows:

| Fiscal year | Amount | Fiscal year | Amount |
|---|---|---|---|
| 1910 | $78,000 | 1913 | $164,000 |
| 1911 | 109,000 | 1914 | 85,000 |
| 1912 | 74,000 | 1915 | 167,000 |

There is no explanation in the record of the reasons for these wide fluctuations in earnings, and their almost rhythmical swing back and forth, in alternate years, between maximum and minimum limits.

There is this further thought in connection with the testimony of the witness Hanson as to the value of the intangibles at the date of purchase. It was Hanson who, in February, 1917, after consultation with his partner, Mallinson, directed that the intangibles of the business be recorded on the partnership books at the value of $1,000,-000. At the time this entry was made, the petitioner partnership had been organized and doing business for 18 months. The earnings for the first six months amounted to $103,000 and were considerably larger than those of three full years in the five-year period preceding the date of purchase. The earnings for the first full fiscal year amounted to $752,000, which was more than four and one-half times the largest earnings of any one of the five preceding years. Such had been the experience of the partnership when the intangibles were recorded on the books in February, 1917; and it is but a logical assumption that the partners, in determining the value to be recorded on the books for the intangibles, gave due consideration to the very large increase in earnings, and that the value determined upon, at that time, reflected their best judgment as to the then value in the light of all existing circumstances and conditions. There is at least no evidence that the intangible value recorded on the books in February, 1917, was intended to reflect the value of the intangibles at the date of purchase, June, 1915.

As to the subsequent earnings of the business, we need but say that there is no evidence which warrants giving consideration to them in an attempt to determine the actual cash value of the intangibles at the date of purchase. If the large earnings realized in subsequent years were reasonably to be anticipated at the date of purchase, that fact has not been established by the evidence. The evidence justifies no broader conclusion than that the business might have reasonably been expected to produce net earnings equivalent to those which had been realized during the five-year period preceding the date of purchase.

Considering that past history of the business, the record of development of its trade-marks and the trade names, the development of world-wide markets for its products, the reputation of the business for the production of commodities of high quality and for fair dealing, the favorable comparison of its trade-marked products with the products of foreign manufacturers generally recognized through-

out the world as the leaders in the industry, the position of prominence in the industry to which the business and those connected with it had attained, and the record of earnings of the business prior to the date of its purchase by the petitioner, we are of the opinion that the actual cash value of the intangible properties purchased by the petitioner partnership from Hiram R. Mallinson, for and with interests or shares in the said partnership was, at the date of purchase, $365,000.

Before proceeding with the disposition of the second issue in this case, it is necessary to dispose of a controversy which arose between the parties during the hearing, as to whether the deficiency asserted by the respondent for the period ended November 30, 1917, is a deficiency in respect of the taxes for a full fiscal year of 12 months or for a fiscal period of 11 months. Counsel for respondent indicated a desire to amend the answer filed in this cause and strike certain admissions. Counsel for the petitioner agreeing that the admissions made in the answer filed should conform to the facts obtaining, stated, " we can straighten it out by having everything in the record ". We will therefore determine the question on the evidence of record. The point is a very important one, for if it be decided that the deficiency is in respect of the tax for a full fiscal year of 12 months, no change in the tax liability as determined by the respondent will result, for, though the precise method used by the respondent in determining the tax liability is not that prescribed by the statute, the result is the same. On the other hand, if it be decided that the deficiency is in respect of the tax for an 11-month period, then the method used by the respondent for determining the excess-profits-tax liability of the period may be contrary to the decision of the United States Court of Claims in *Strong, Hewat & Co.* v. *United States*, 62 Ct. Cls. 67.

In the petition it is alleged as follows:

3. The taxes in controversy are profits. taxes for the 11 months fiscal period ended November 30, 1917, and the 1 month fiscal period ended December 31, 1917, and are more than $10,000, to-wit: approximately $36,272.96.

The foregoing allegation was admitted by the respondent in his answer.

When the peculiar taxing status of partnerships under the Revenue Act of 1917 is recognized, and consideration is given to the statements contained in the deficiency notice and in the audit letters issued by the respondent prior to the mailing of the deficiency notice, it is readily comprehensible that the petitioner could make this pleading in absolute good faith and the respondent could answer in similar good faith, and yet the parties entertain different views as to whether the deficiency is in respect of the taxes of a full fiscal year of 12 months or a fiscal period of 11 months.

Under the Revenue Act of 1917, a partnership, as such, was liable for an excess-profits tax only. The respondent held that the petitioners were affiliated and determined their tax liability upon the basis of a consolidated return. The accounting period of the petitioner partnership was a fiscal year ending November 30, 1917, while that of petitioner corporation was the calendar year; and, since the partnership was the parent or principal reporting company, the partnership's fiscal year was adopted by the respondent as the basis for the determination of the tax liability of the consolidated group. Section 200 of the Revenue Act of 1917 provides that in the case of a taxpayer having a fiscal year ending in 1917, " the tax for such taxable year shall be that proportion of the tax computed upon the net income during such full fiscal year which the time from January first, nineteen hundred and seventeen, to the end of such fiscal year bears to the full fiscal year." Instead of using the computation outlined in the statute, the respondent, as is evident by the audit letters upon which the deficiency notice is based, computed the tax upon the basis of eleven-twelfths of the consolidated net income for the fiscal year, eleven-twelfths of the consolidated invested capital, and eleven-twelfths of the specific deduction of $6,000 provided by section 203 (b) of the Revenue Act of 1917. Had the respondent proceeded to determine the tax liability in the manner outlined in section 200, that is, by taking eleven-twelfths of the tax computed upon the basis of the net income of the full fiscal year, the full invested capital and the full specific deduction, he would have obtained no different result than that which he reached by the method he followed; but, in that event, no controversy could have arisen as to whether the deficiency is in respect of the tax of a full fiscal year or a fiscal period of 11 months.

The petitioners would hold the respondent to his answer to the petition, in which case it may be that the tax liability would be determined upon the basis of the consolidated net income, as determined by the respondent, which is but eleven-twelfths of the net income of the full fiscal year ended November 30, 1917, and the full invested capital and specific deduction, which, according to the decision in *Strong, Hewat & Co.* v. *United States, supra*, is the proper method for determining the excess-profits tax under the Revenue Act of 1917 for a period of less than 12 months. The audit letters and the deficiency notice, however, show that respondent's deficiency determination is in respect of the taxes of a full 12-month period and not a short fiscal period of 11 months. In view of what has already been said, and as the evidence clearly shows the situation to be such, we are constrained to hold that the deficiency determination of the respondent, for the period ended November 30, is in respect of the tax liability of a full fiscal year of 12 months and not

in respect of the tax liability of a shorter period, and, in that case, the decision in *Strong, Hewat & Co.* v. *United States, supra,* is not applicable in computing the tax liability of that year. Since it produces the same result as the method outlined in the statute, we see no objection to the method used by the respondent in computing the tax liability for the fiscal year ended November 30, 1917.

Respondent has determined the excess-profits-tax liability of the petitioners for the one-month period ended December 31, 1917, upon the basis of a consolidated net income of $35,705.59, a consolidated invested capital of $152,294.45, and a specific deduction of $500. The invested capital of $152,294.45 is but one-twelfth of the full consolidated invested capital, as determined by the respondent, and the specific deduction of $500 is but one-twelfth of the specific deduction of $6,000 allowed domestic partnerships by section 203(b) of the Revenue Act of 1917.

Petitioner partnership was dissolved on June 1, 1918, and succeeded by a corporation. Such fact brings this case squarely within the decision of the United States Court of Claims in the case of *Strong, Hewat & Co.* v. *United States, supra,* which was followed by this Board in *Louis Hymel Planting & Manufacturing Co.,* 5 B. T. A. 910, and within the provisions of Treasury Decision No. 3848. The excess-profits-tax liability should be recomputed upon the basis of the full invested capital and the full specific deduction allowed by section 203 of the Revenue Act of 1917.

> *These proceedings will be restored to the General Calendar for further hearing pursuant to Rule 62 (a).*